SARAH BEALL CARNEY *v.* JAMES G. LINDSEY'S HEIRS ET AL.

Implied Trust—Purchaser from Trustee, with Notice, takes Property Subject to Trust.

Where land is affected by an implied trust, the purchaser, with notice, takes the property effected threby, and is substituted for the Cestui Que Trust.

Contracts Between Trustee and Beneficiary—Constructive Fraud—Construction of.

Courts of Equity have prudently established the preventive doctrine of constructive fraud whereby contracts by trustees for acquiring the property of their confiding and comparatively uninformed beneficiaries, are prima facie presumed fraudulent, and will be so adjudged without proof on either side, thus imposing on a trustee buying his beneficiaries, property the onus of satisfactory proof of the reciprocity and integrity of the contract.

Acquiesence by Beneficiary Under Sales of Cestui Que Trust.

Where land is transferred to cestui que trust under an implied contract, acquiesence for a period of 20 years thereafter, in sales made thereunder, for an adequate price of the land at its then value, will bar any subsequent right of the beneficiary to revoke the sale under the imputatation of constructive fraud.

September 16, 1867.

APPEAL FROM CAMPBELL CIRCUIT COURT.

OPINION OF THE COURT BY JUDGE ROBERTSON:

William Kennedy, an early immigrant to Kentucky, and who died about the year 1795, devised his estate, apparently large, to

his only children, James Kennedy and Jannette Beall, wife of Benjamin Beall. In the year 1800 the devisee, James, conveyed to his brother-in-law, Beall, his interest, with some exceptions, in the testator's estate, and as a part of the consideration Beall assumed to pay all the testator's debts.

Among those debts was one to R. E. Cummins for about $3,500, and of the estate so devised and conveyed·two tracts of about 4,424 acres·of comparatively poor land in Campbell county, Kentucky, constituted a portion. Beall died intestate in 1808, and his wife, Janette, in 1811, leaving nine children; by the death of those the five surviving, of whom James G. Lindsey's wife and the appellant, Sarah B. Carney, were two, and were therefore entitled by descent to two-fifths of the said 4,424 acres of land. In 1822 Kennedy with Thomas D. Carneal and his brother-in-law, Lindsey, and his sureties, replevied a judgment which Cummins recovered for his said debt of about $3,500, and having, soon afterwards, also enjoined it, the injunction was, in 1830, perpetuated as to all except $1,152.92 for which an execution was issued on the 11th day of February, 1831, against Carneal and Lindsey, Kennedy, in the meantime, having died.

Under statutory authority previously given to sell any of Beall's interests in his lands for relieving his estate of its impending liabilities, of which the Cummins' debt was one, Carneal and Lindsey conveyed to Carneal himself the 4,424 acres of land *"for the purpose of enabling the said Thomas D. ^arneal to surrender the lands herein conveyed to the proper officer in extinguishment of said debt."* And, as the conveyance by Carneal himself did not pass to him a perfect right, and perhaps also as there might have been doubt as to the validity of the legislative authorization, all the heirs of Janette Beall, including the appellant and her husband, conveyed to Carneal their legal title for the purpose, as we presume, of confirming the legislative act and also of satisfying the conveyance to Carneal. The title being thus completed in Carneal, he surrendered the land to the execution under which, being valued at $13,272, it was all sold for $400 to Cummins as the highest bidder at the official sale on the 25th of April, 1831, and was therefore subject, for a year, to redemption.

In October, 1831, while the land was thus redeemable, an *alias* execution having been issued against Carneal and Linsey for the balance unpaid by the sale, the former released to the

latter all his title to the land for the recited consideration of one dollar, the evident object of which alienation was to enable Lindsey to redeem and dispose of the land for the satisfaction of the judgment. And, on the same day, Lindsey sold 800 acres of the land to Graham for $1,000, and eleven days afterwards paid the balance due on the execution; and afterwards, by the payment of the $300 and 10 per cent to Cummins, redeemed the land, and thus retained the legal title to 3,624 acres of it.

Lindsey having been Admr. of Beall's estate heavily encumbered with debt and not appearing to have made a final settlement, the appellant and her husband, on the 28th day of May 1833, for the recited consideration of five hundred dollars ($500), sold and conveyed to him all their residual interest in the unsold estate with this qualifying declaration: "It being expressly understood that the conveyance is not to be construed in any event to pass the title to any tracts of land heretofore sold by them."

In the same year Lindsey died intestate, suddenly, with cholera, leaving seven infant children as his heirs, who claimed and used the land as their own. And in August, 1856, Carney died, his wife, the appellant, surviving. And on the 23d day of July, 1859, she brought this suit in equity for recovering one fifth of the 3,624 acres of land still claimed by her as resulting from the foregoing facts. The Circuit Court having finally dismissed her petition, she prosecutes this appeal from that judgment.

Carneal was not a purchaser for his own use. The evident object of investing him with the legal title was only to enable him to subject to the satisfaction of the execution against Lindsey and himself as much of the land as might be necessary for the purpose and in that way fulfill to that extent the purpose of the legislative enactment and of the conveyance by the heirs of Justice Beall. Consequently, after satisfying the execution by a sale of a portion of the land, a trust would have resulted to the use of those heirs to the extent of the residue. And, thus holding as trustee with Lindsey's knowledge, his conveyance to Lindsey was subject to the same implied trust, only substituting Lindsey for himself. When, therefore, by the sale of 800 acres of the land, and by other means, Lindsey redeemed the land and paid the amount of the execution, he held the residual 3,624 acres on an implied trust for use of the five heirs of Janette Beall, subject to a lien for whatever he may have paid with his own means. But, notwithstanding

the long and elaborate preparation of this case, the record does not show satisfactorily what he paid in that way. There is not even any allegation that there was anything in his hands as Beall's administrator, and the long lapse of time and other circumstances conduce to show that nothing was due on that account. Nor does it appear that he had appropriated either to his own use or to the payment of the Cummins debt the proceeds of any other land than the 800 acres sold to Graham. In this state of case we should be inclined to the presumption that, in paying off the entire Cummins debt, he applied more than $1,200 of his own funds. And pre- ponderating probability inclines to the presumption that the conveyance of 1833 by the appellant and husband adjusted and closed all previous accounts between them. If that conveyance include the 3624 acres of land in controversy and should not be set aside in equity, the appellant has no available claim to any portion of that land.

The appellants' conveyance to Carneal was a sale divesting her interest only to the extent of land finally appropriated to the extinguishment of the Cummins debt, for discharging which that trust sale was made. Consequently, when Lindsey, as implied trustee, paid that debt, her interest in the 3624 acres remained unsold, and her resulting equity therein was a vendible right of which she had never been divested by sale or otherwise. She had by previous sales parted with her interest in two other smaller tracts of land, and probably had an unsold interest in some other lands than the 3624 acres. But how far any such doubtful interest was then available or of what estimated value there is neither proof nor allegation in this record. We should, however, presume, from all the apparent circumstances, that it was of questionable availability and of inconsiderable value. Owning, as the appel- lant did, her beneficial interest in the 3624 acres at the date of her contract with Lindsey in 1833, her conveyance to him of all her unsold interests in lands inherited from her father, included her then available and, in the essential sense, unsold interest in that tract. Whether that conveyance was binding and divested her of that interest is a question of more difficult solution.

When that contract was made Lindsey held the legal title— subject first to his own probable lien—in trust for her and her co-heirs. And, to *prevent* fraud in such cases—in which the temptation is so peculiarly strong, the means of success so ample,

and the proof of actual fraud so difficult—courts of equity have prudently established the preventive doctrine of constructive fraud whereby contracts by trustees for acquiring the property of their confiding and comparatively uninformed beneficiaries are *prima facie* presumed fraudulent, and will be so adjudged without proof on either side, thus imposing on a trustee buying his beneficiaries property the onus of satisfactory proof of the reciprocity and integrity of the contract.

But is there such proof in this case? We think there is, remotely and inferentially, enough.

Actual sales of the land constitute the best evidence of its value. The 800 acres sold to Graham may be presumed to be the best of the tract, and Graham paid only $1.23 an acre. A sale afterwards of another portion under execution against Lindsey's heirs brought only 75 cents an acre, and the estimates of the witnesses as to the average value of the entire tract, when carefully analysed are not essentially different from Carneal's valuation at 50 cents an acre, at this rate, or even something higher, the 3624 acres at the date of the appellant's conveyance to *Lindsey,* deducting his wife's fifth part, would not have been more than sufficient to reimburse him the amount then due to him for redeemnig the land and paying the Cummins debt with its incidental interest and long accumulating costs. And there is neither proof nor ground for presumption that he acquired by her conveyance any other available property to the extent of the $500 paid to her for her interest in her father's estate. Apparently, therefore, the consideration for her conveyance of 1833 was adequate and the contract fair and understandingly made.

But this deduction, however questionable without the confirmation of time, is, as we think, conclusively fortified by her apparent acquiescence for 20 years and in long after sales to subpurchasers who are parties and until after the land, from adventitious circumstances, had very much increased in vendible value. Although she was covert until about three years before she brought this suit, yet the record shows that her own self will controlled her husband in the management of their affairs, and especially those that were more hers than his.

Consequently, waiving the question of protection to purchasers in good faith under her conveyance to Lindsey, it seems to this Court that the appellant's unnecessary and presumptive

acquiescence, as well as that of her husband, in their conveyance of 1833 to Lindsey sealed it as valid and free from the imputation of constructive fraud, and now closes the door of equity against her stale and antiquated claim.

Wherefore, concurring with the circuit court as to the validity and effect of the appellants conveyance to Lindsey, this court cannot disturb the judgment of that court, which is therefore affirmed.

*Stevenson & Meyers, for appellant.*

*Hallam, for appellees.*